# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James F. Holderman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 3674 | **DATE** | 8/29/2003 |
| **CASE TITLE** | KAUPAS et al vs. VILLAGE OF UNIVERSITY PARK et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____ .

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____ .

(4) ☐ Ruling/Hearing on _____ set for _____ at _____ .

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(7) ☐ Trial[set for/re-set for] on _____ at _____ .

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____ .

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Defendants' motion for summary judgment is granted in part and denied in part. The previously set schedule is modified as follows: The parties shall submit the joint final pretrial order with all motions in limine and supporting memoranda by September 9, 2003. Responses are to be filed by September 16, 2003. Final pretrial conference is reset to September 23, 2003 at 4:30 pm. Trial date of September 29, 2003 shall stand.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| ✓ | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

number of notices

SEP 2 - 2003

date docketed

docketing deputy initials

8/29/2003

date mailed notice

**Document Number**

33

JS

courtroom deputy's initials

U.S. DISTRICT COURT
CLERK
03 AUG 33 AM 8:00
FILED FOR DOCKETING
Date/Time received in
central Clerk's Office

JS7

mailing deputy initials

SEP 2 - 2003

| | |
|---|---|
| Fred Kaupas and Rosanne M. Kaupas, as individuals, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) )  No. 02 C 3674 |
| Village of University Park, a municipal corporation; Board of Trustees of the Village of University Park, a body politic; Village Manager Elbert Shaw, individually and in his official capacity; Police Chief Craig Martin, individually and in his official capacity; Police Sergeant Gregory Box, individually and in his official capacity; and other unknown conspirators, | ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

On January 14, 2003, plaintiffs Fred Kaupas ("F. Kaupas") and Rosanne M. Kaupas ("R. Kaupas") filed a seven-"claim" consolidated amended complaint against defendants Village of University Park ("Village"), Board of Trustees of the Village of University Park ("Board"), Elbert Shaw ("Shaw"), Craig Martin ("Martin"), and Gregory Box ("Box") alleging numerous reverse discrimination claims described in detail below.[1] On July 18, 2003, defendants moved, pursuant to

---

[1] Plaintiffs failed to comply with Federal Rule of Civil Procedure 10(b), which requires each claim founded on a separate transaction or occurrence to be set forth in a separate count. This is but one of many transgressions of the Rules of Civil Procedure or Local Rules. This court has done its best to determine the claims advanced and will explain them in the text below. In

1

33

Federal Rule of Civil Procedure 56, for summary judgment. For the reasons explained below, defendants' motion is granted in part and denied in part.

## STATEMENT OF FACTS[2]

Viewing all facts in the light most favorable to plaintiffs and construing all ambiguities in their favor, in January 2001, Board amended a Village ordinance reducing the number of deputy chief of police positions from two to one. At this time, F. Kaupas, a white male, was the deputy chief of police. The acting chief at the time (and now current chief), Martin, is a black male. Village manager Shaw and officer (now sergeant) Box also are black males. R. Kaupas is a white female and worked for Village as a civilian employee in the police department.

On March 16, 2001, Martin ordered F. Kaupas to provide Martin with a list of all pending investigations and thereafter provide him with a weekly status report. This weekly status report had

---

addition, this court has interpreted each enumerated "claim" to actually be a "count" and will refer to each as such. Thus, the consolidated amended complaint has seven counts, although it has many more claims.

[2] The facts assumed to be true for purposes of this summary judgment motion are derived in part from defendants' Local Rule 56.1(a) statement of facts and plaintiffs' response thereto and plaintiffs' Local Rule 56.1(b) statement of facts and defendants' response thereto. Before proceeding, however, this court strongly urges both counsel for plaintiffs and counsel for defendants to review Local Rule 56.1 and Malec v. Sanford, 191 F.R.D. 581 (N.D. Ill. 2000). Both counsel failed miserably to comply with Rule 56.1. Because of this, the record on summary judgment is convoluted and confusing. By failing to comply with the Local Rules, the parties have made it very difficult for this court to decipher the claims at hand, the relevant issues, and the parties' arguments. It is not this court's obligation to scour the record, but because both parties have not performed their obligations, this courts has no choice.

In the case at hand, neither party set forth a statement of facts in its respective memorandum. Defendants state that "[t]he page limitations set forth by Local Rule do not allow a detailed restatement of the facts and undisputed evidence and the facts swill [sic] simply be highlighted in the argument below." (Defs' Mem. at 1.) This comment is without merit, as defendants could have sought leave to file a brief in excess of fifteen pages.

not been previously requested of F. Kaupas by any prior police chief. Martin did not inquire about the data until December 2001.

On June 6, 2001, Shaw and Martin convened a mandatory meeting of all police department personnel to address morale and training issues. At the time of the meeting, approximately half of the full time officers were white and half black. Box and a couple of other black officers had been drinking prior to attending the meeting. The meeting became heated with black officers saying such things as "us vs. them," "our turn to shine," "I get so mad I'd cap people except I would go to jail," and "more of us than there are of them now." (Pls.' Mem. at 4.[3]) Immediately after the meeting, Box said, "these white mother fuckers have to go." (Defs.' Stmt. of Facts ¶ 42.) Neither Shaw nor Martin, who both presided over the meeting, interceded to control such comments or admonished any officers. The following day, at a meeting of the Board of Police and Fire Commissioners, chairperson Gloria Barnett-Brookins ("Barnett-Brookings") said that "we are not going to hire any more white boys." (Pls.' Mem. at 4.)

After the June 6 department meeting, on June 20, R. Kaupas sent a letter of complaint signed by her and six other department members to Martin. She outlined what happened at the meeting and requested that Martin "take appropriate action to this problem immediately." (Pls.' Mem. at 5.) About two-and-a-half weeks later, Village Finance Direct Steven Rosenquist ("Rosenquist") inquired of Shaw as to whether F. Kaupas was entitled to overtime pay. Shaw determined that F. Kaupas was

---

[3] Pursuant to Local Rule 56.1, in their memoranda parties are supposed to cite to their statements of undisputed facts or responses, not directly to the record. Plaintiffs, however, cite directly to the record in their memorandum. Worse yet, defendants do not cite to any record whatsoever in their memorandum! For example, they quote from the Village policy manual but provide no citation. (Defs.' Mem. at 11.) Although not required to do so, this court will consider the evidence presented in plaintiffs' memorandum and has done its best to find the appropriate portions of the record to support defendants' uncited statements.

an exempt employee and directed that he repay prior overtime payments to Village. F. Kaupas maintained that former police chief Thomas Leonard ("Leonard") had approved his overtime in the past. Shaw claims that Leonard had never authorized paid overtime for F. Kaupas. (Defs.' Stmt of Facts ¶ 65.) However, as plaintiffs point out, Leonard testified that the policy had been that deputy chiefs had the discretion to take financial compensation or compensatory time for any overtime worked. (Pls.' Mem. at 6.) Thereafter, because F. Kaupas had told Shaw that Leonard had authorized overtime (which Shaw believed was a lie), Shaw demoted F. Kaupas to sergeant and promoted Mel Easley ("Easley"), a black male, to deputy chief.[4]

---

[4] Plaintiffs' counsel, in the memorandum filed in opposition to defendants' motion, seems to do everything in his power to try to confuse this court. First, throughout, plaintiffs refer to "Kaupas." Importantly, there are *two* Kaupas plaintiffs in this case. Often the context does not readily make clear which plaintiff is being referred to. Second, plaintiffs often use the singular possessive "plaintiff's" without any reference to which plaintiff. This court had trouble determining which plaintiff was at issue or whether plaintiffs meant to use the plural possessive "plaintiffs'." Third, for example, plaintiffs state: "*Kaupas* testified that Martin screamed at *him* . . . (R. Kaupas Dep. pp. 66)." (Pls.' Mem. at 7 (emphasis added).) The dilemma created by this phrase is that plaintiffs refer to "Kaupas" without specifying which one, then go on to state "him"–thus context would seem to indicate F. Kaupas–but then cite to Rosanne Kaupas's deposition for testimony that Fred Kaupas gave. Finally, and most troublesome, plaintiffs' exhibits, which were not originally submitted to this court, are all but useless. Plaintiffs have submitted to this court in chambers, but have not filed in the record, three stacks of papers which purportedly correspond to their memorandum, 56.1(b) response, and 56.1(b) statement of additional facts. In cover letters to this court accompanying each stack of documents, plaintiffs state that "[t]he order of the documents track the cites in the pleadings." Overlooking the fact that the exhibits are not "pleadings," see FED. R. CIV. P. 7(a), this order of presentation is of no help to this court. Say for example that this court needed to find an exhibit cited to on page ten of plaintiffs' Rule 56.1(b) statement. How is this court to go about locating this exhibit? What this court had to do was cull through each of the pages until it found the exhibit in questions. Then, oftentimes, the deponent was not identified, preventing this court from verifying the exhibit or plaintiffs' statement. Tremendous judicial resources have been wasted.

F. Kaupas filed a complaint with the Illinois Labor Board regarding the overtime pay dispute. After receiving the complaint, Shaw distributed it along with a cover memorandum to all employees[5] emphasizing that racial and sexual discrimination and harassment would not be tolerated and requesting employees to report prior instances of racial or sexual harassment to him. Within the next week, seven police department employees sent memos to Shaw. Because he believed the memos were false and baseless, Martin did not investigate any of the incidents set forth in the memos. In addition, Shaw believed they lacked merit and took no further action.

R. Kaupas saw two co-workers reading the memo from Shaw and F. Kaupas's complaint. She became upset and had a confrontation with Martin. Martin heard her mumble "mother fucker" under her breath. As a result, Martin suspended R. Kaupas for two days without pay. R. Kaupas denies making this comment.

On September 6, 2001, plaintiffs attended a Monee Township meeting to vote on a referendum. Plaintiffs drove F. Kaupas's departmental take-home vehicle, which Village had allowed F. Kaupas to use since approximately 1997 or 1998. Village's employee manual stated that "[a]lthough Village employees are encouraged to participate in political activities, they may not do so while they are on duty nor may they use their position or Village resources for political purposes." (Defs.' Stmt. of Facts ¶ 106.) Shaw admitted that it was not deemed politically motivated abuse to vote. In response to trustees' complaints about F. Kaupas driving his take-home vehicle to vote, Shaw amended Village's take-home vehicle policy. Under the new policy, employees who were not residents of Village, including F. Kaupas, were not allowed to use a Village vehicle but instead were

---

[5] It is not clear whether this was all Village employees or just those who worked in the police department.

5

to use their personal vehicles and then be reimbursed for mileage by Village. In his deposition, Shaw stated that he believed removing F. Kaupas's vehicle violated F. Kaupas's First Amendment free speech rights. (Defs.' Stmt. of Facts ¶ 111.) After a grievance was filed on F. Kaupas's behalf, Shaw reinstated F. Kaupas's take-home vehicle privileges.

In December 2001, days after Village received R. Kaupas's EEOC complaint, Martin, perhaps upon a request from Shaw for information, instructed F. Kaupas to prepare a statistical report on certain investigations covering the years 1999, 2000, and 2001. Shaw stated at his deposition that the request for this data "doesn't make any sense to me." (Pls.' Mem. at 12.) It took F. Kaupas eighty hours to complete the data collection manually, even though such information was readily available on the computer.

On January 2, 2002, F. Kaupas submitted his letter of resignation, effective July 15, 2002. In May, Martin ordered F. Kaupas, along with two other officers, to inventory the evidence locker. At some point in the spring, Box stated that "it's our time to shine. Fred's got to go. I'm going to get his job." (Defs.' Stmt. of Facts ¶ 143.) After F. Kaupas's retirement, Box was promoted to head of the investigations division. A few months prior to his retirement, Village removed F. Kaupas's name placard from his door. By memorandum dated May 31, 2002, F. Kaupas was placed on administrative leave effective June 1 and was paid through his retirement. Shaw made the decision to place F. Kaupas on administrative leave because Shaw believed that F. Kaupas was hostile to the Village for what the Village had done to him.

Finally, on June 4, 2002, R. Kaupas received a pornographic e-mail from Box. Attached to the e-mail was a video which depicted a naked man defecating in a naked woman's mouth. The video was approximately one minute in length. After viewing the video once, R. Kaupas deleted it.

She finished work that day but never returned. She tendered her resignation a few days later. Her resignation letter did not mention the e-mail from Box.

## STANDARD OF REVIEW

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the evidence of the nonmovants must be believed and all justifiable inferences must be drawn in the nonmovants' favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). This court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. A party who bears the burden of proof on a particular issue, however, may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). As stated above, it is not the function of this court to scour the record in search of evidence to defeat a motion for summary judgment; the nonmoving party must identify with reasonable particularity the evidence upon which that party relies. Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996). The evidence relied upon must be competent evidence of a type otherwise admissible at trial. Id.

7

In this section of the opinion, this court will analyze the claims it has construed from plaintiffs' consolidated amended complaint. Plaintiffs' unclear allegations have unnecessarily complicated this task. This court had difficulty determining which plaintiff (or both) was suing which defendant (or defendants) on what claim. Moreover, in their summary judgment materials, defendants and especially plaintiffs address a few of the claims in such a cursory way that this court wonders if they are really claims at issue at all. Nonetheless, this court will address what appears to be all of the claims. Unless otherwise noted, both F. Kaupas and R. Kaupas advance the claim under discussion.

## I. Count I Section 1983 Claims

### A. Section 1983 Claims Against Village and Board

Pursuant to 42 U.S.C. § 1983, plaintiffs advance claims against Village; Board; and Shaw, Martin, and Box in their individual and official capacities. An official capacity claim against a governmental official is the same as a claim against the governmental entity. Kentucky v. Graham, 473 U.S. 159, 165-66 (1985). Thus, plaintiffs' claims against Shaw, Martin, and Box in their official capacities are actually claims against Village. Moreover, plaintiffs' claims against the Board are

---

[6] It certainly would have been helpful to this court if the parties would have properly drafted their memoranda. Ideally, the memorandum applies the law to the specific facts of the case. Malec, 191 F.R.D. at 585. Here, defendants' memorandum is overflowing with case law but barely mentions the facts, and, as explained above, when facts are discussed, the record is not cited to. On the other extreme, plaintiffs' memorandum is basically a recitation of the facts and some argument. In fact, their memorandum reads almost like their statement of additional undisputed facts. Conspicuously absent from plaintiffs' memorandum is any case authority in support of their position. Once again, plaintiffs' and defendants' counsel's failure to comply with the local rules has caused this court to expend much more time than should have been necessary to resolve this motion.

actually claims against Village itself. There is no indication that plaintiffs seek to hold Board members liable in their individual capacities.

The Seventh Circuit has stated, citing Monell v. Department of Social Servs., 436 U.S. 658, 690-91 (1978), that:

> [a] local governmental unit is subject to suit under 42 U.S.C. § 1983 because it is deemed a "person" within the meaning of that provision. The Supreme Court has consistently interpreted this language as barring *respondeat superior* liability on the part of a local governmental unit. Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." The caselaw has identified three instances in which a municipality can be said to have violated the civil rights of a person because of its policy: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) "a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law;'" or (3) an allegation that the constitutional injury was caused by a person with "final policymaking authority."

Baxter v. Vigo County Sch. Corp., 26 F.3d 728, 734-35 (7th Cir. 1994) (citations omitted). Clearly, Village is not liable, simply as the employer, for the acts of Shaw, Martin, or Box. Plaintiffs attempt to proceed only under the third prong and argue that Village can be held liable because Shaw and Martin are final policymakers.

The determination as to whether a person is a final policymaker for § 1983 purposes is a question of local law. Auriemma v. Rice, 957 F.2d 397, 400 (7th Cir. 1992). Pursuant to Illinois law, a municipal manager, such as Shaw, merely has the power to enforce municipal laws and ordinances and has no right to vote at board meetings. 65 ILCS 5/5-3-7(1), (6). A final policymaker, conversely, has the "authority to adopt rules for the conduct of government. Authority to make a final decision need not imply authority to establish rules." Auriemma, 957 F.2d at 401. According to Illinois law, Shaw, and certainly Martin, did not have the authority to adopt rules for the conduct

of Village. Only the Board possessed such power. Therefore, this court finds that neither Shaw nor Martin is a final policymaker for § 1983 purposes.

The only action of the Board, the final policymaker of Village, at issue in this case is its passage of an ordinance reducing the number of deputy chiefs of police from two to one. Plaintiffs have not pointed to any evidence establishing that this express policy caused F. Kaupas to lose his job or that such ordinance was based on racial animus. Consequently, because plaintiffs have no basis in the law to hold Village or Board liable, Village and Board are entitled to summary judgment on all § 1983 claims against them.

**B.** Section 1983 Equal Protection Claims Against Individual Defendants

1. Disparate Treatment

Plaintiffs assert that defendants are personally liable for discriminating against them because of their race in violation of the Fourteenth Amendment's Equal Protection Clause and 42 U.S.C. § 1983. As the Seventh Circuit recently explained, "the same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection." Williams v. Seniff, No. 02-1231, slip op. at 22 n.13 (7th Cir. Aug. 20, 2003). Further, like Title VII, plaintiffs "can prevail on [their] equal protection claim[s] by offering direct proof of discriminatory intent, or [they] may prove discriminatory intent by circumstantial evidence." Id. at 21. Therefore, the Title VII disparate treatment discussion below is applicable to plaintiffs' equal protection disparate treatment claims here. However, "[s]ection 1983 creates a cause of action based upon personal liability and predicated upon fault. An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation." Wolf-Lillie v. Sonquist, 699 F.2d 864, 869 (7th Cir. 1983).

F. Kaupas alleges that Shaw discriminated against him on the basis of race with regards to the terms and conditions of his employment by demoting him and demanding he reimburse Village for allegedly improper overtime pay.[7] R. Kaupas asserts that Martin suspended her because of her race.[8] The undisputed facts show that Box was not personally involved in making any of these decisions; thus, summary judgment is granted in his favor on the § 1983 disparate treatment claims. To be clear, and as is explained in detail below, with respect to Shaw (for F. Kaupas's claim) and Martin (for R. Kaupas's claim), because issues of material fact exist whereby a jury could infer intentional discrimination, summary judgment must be denied.

> 2. Hostile Work Environment

Plaintiffs argue that Shaw, Martin, and Box personally created a racially hostile work environment in violation of the Equal Protection Clause and § 1983. R. Kaupas asserts that the individual defendants created a sexually hostile work environment. As with the § 1983 equal protection disparate treatment claims above, § 1983 equal protection hostile work environment claims follow the same standard as Title VII. McPhaul v. Bd. of Comm'rs of Madison County, 226 F.3d 558, 566 n.6 (7th Cir. 2000). This court will discuss fully plaintiffs' hostile work environment claims below.[9] To be clear, though, because material facts are in dispute as to whether Shaw and/or Martin created a hostile environment, summary judgment is denied as to the racially hostile work

---

[7] F. Kaupas does not actually specify against which defendants this § 1983 claim is brought, but the undisputed facts show that only Shaw was involved in making these decisions, and thus potentially only he can be held liable.

[8] Again, R. Kaupas does not indicate who the defendant is, but because only Martin was involved in making the decision to suspend her, he is the only potentially liable defendant.

[9] Only the first part of the Title VII analysis, i.e., whether the individual defendants personally created a subjectively and objectively hostile environment, is relevant to § 1983 liability.

environment claims.[10]  However, summary judgment is granted with regard to the sexually hostile work environment.

C.   <u>Section 1983 First Amendment Retaliation Claim Against Shaw</u>[11]

To prevail on a First Amendment retaliation claim, F. Kaupas[12] must show that:  (1) his speech was a matter of public concern; and (2) the speech played at least a substantial part in Shaw's decision to remove F. Kaupas's take-home vehicle privileges.  If F. Kaupas can carry his burden on these two elements, Shaw can prevail only if he proves by a preponderance of the evidence that Village's interest, as an employer, in efficiently providing government services outweighs F. Kaupas's First Amendment interests, or if Shaw can prove that Village would have disciplined F. Kaupas even in the absence of the speech.  <u>Gustafson v. Jones</u>, 290 F.3d 895, 906 (7th Cir. 2002). In the case at hand, the speech at issue is F. Kaupas's voting at a township meeting.  With respect to the prima facie case, Shaw admitted that the voting did not violate departmental policy, i.e., was not politically motivated, and that it played a part in Shaw's decision to amend the Village policy. Shaw argues, however, that driving the vehicle to vote violated departmental policy.  Shaw's own deposition testimony contradicts this argument.  Shaw admitted that it was not deemed politically

---

[10] With respect to Box, summary judgment on this § 1983 claim is granted.  The undisputed facts show that at most he made a comment or two, such as "these white mother fuckers have to go."  Although crude and highly offensive, such an isolated comment does not by itself create an objectively hostile work environment.  As to supervisors Shaw and Martin, as will be discussed in the text below, they not only acquiesced in numerous racially divisive comments but also failed to take any actions to remedy the problems.  Consequently, a jury could find that they personally created an objectively hostile environment.

[11] Because the undisputed facts show that Shaw alone, and not Martin or Box, had anything to do with the Village vehicle policy, only Shaw potentially can be held liable under § 1983.

[12] Although it appears that R. Kaupas may have alleged a First Amendment violation, she has produced absolutely no evidence in support of her claim.  Therefore, even if such claim is in fact alleged, Shaw is entitled to summary judgment in his favor.

motivated abuse to vote at a township meeting. (Pls.' Mem. at 8, citing to Shaw Dep. at 257.) Further, Shaw conceded that he believed his actions violated F. Kaupas's free speech rights. (Defs.' Stmt. of Facts ¶ 111.) A material question of fact remains as to whether Shaw would have eliminated the vehicle privilege in the absence of F. Kaupas's vote. Consequently, summary judgment must be denied.

II.    Count II Section 1985 Claim Against Individual Defendants

In order to state a claim under 42 U.S.C. § 1985(3), plaintiffs must demonstrate (1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of equal protection of the laws, (3) an act in furtherance of a conspiracy, and (4) an injury to person or property or a deprivation of a right or privilege granted to U.S. citizens. Green v. Benden, 281 F.3d 661, 665 (7th Cir. 2002). In order to establish the existence of a conspiracy, plaintiffs must demonstrate that the conspirators had an agreement to inflict injury or harm upon plaintiffs. Hernandez v. Joliet Police Dept., 197 F.3d 256, 263 (7th Cir. 1999). In the case at hand, plaintiffs have not submitted any evidence of a conspiracy between Shaw, Martin, or Box to deprive plaintiffs of equal protection of the laws. In fact, plaintiffs spend one short paragraph on the issue and make sweeping generalizations. (Pls.' Mem. at 14-15.) Furthermore, under the intracorporate conspiracy doctrine, a conspiracy cannot exist solely between members of the same entity. Payton v. Rush-Presbyterian-St. Luke's Med. Ctr., 184 F.3d 623, 632 (7th Cir. 1999). The Seventh Circuit has made clear that this intracorporate conspiracy doctrine applies to municipal employees except in "egregious circumstances." Id. at 633. In Hartman v. Bd. of Trustees of Cmty. College, 4 F.3d 465 (7th Cir.1993), the Seventh Circuit explained that such egregious circumstances do not include every instance of invidiously discriminatory motivation but rather exist when employees are "motivated

*solely* by personal bias." Id. at 470 (emphasis added). Here, plaintiffs have not shown that the individual defendants were motivated solely by personal bias. Consequently, summary judgment as to plaintiffs' § 1985 claims is granted.

III.    Count III Section 1986 Claim Against Individual Defendants

42 U.S.C. § 1986 establishes a cause of action against any person who fails to prevent a conspiracy to violate civil rights. Because, as stated above, as a matter of law, no conspiracy existed between Shaw, Martin, and Box, they cannot be held liable for failing to prevent a conspiracy. Therefore, defendants' motion for summary judgment on this claim is granted.

IV.    Count IV Section 1981 Claims Against Village

Claims pursuant to 42 U.S.C. § 1981 are analyzed under the same standards as Title VII. Logan v. Kautex Textron N. Am., 259 F.3d 635, 637 n.1 (7th Cir. 2001). As such, the Title VII analysis below applies to plaintiffs' § 1981 claims.

V.    Count V Title VII Claims Against Village

Under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-15, it is unlawful for an employer, such as Village, "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . [or] sex . . . ." 42 U.S.C. § 2000e-2(a)(1). Plaintiffs advance both individual disparate treatment and hostile work environment claims.

A.    Disparate Treatment (F. Kaupas)

F. Kaupas alleges that he was demoted from deputy chief to sergeant on the basis of his race in violation of Title VII. He has two methods available to him to prove that Village discriminated

14

against him because of race: (1) the direct method or (2) the indirect method. <u>Venturelli v. ARC</u> <u>Cmty. Servs., Inc.</u>, 336 F.3d 606, 612 (7th Cir. 2003). F. Kaupas clearly proceeds under only the first of these, the direct method. (Pls.' Mem. at 2 ("Our memorandum will focus on the direct method.").) As such, this court will not address F. Kaupas's claim under the indirect method.

Under the direct method, two types of evidence are permissible: direct and circumstantial. <u>Venturelli</u>, 336 F.3d at 612. Direct evidence includes evidence that if believed would prove the fact in question "without reliance on inference or presumption." <u>Id.</u> The Seventh Circuit has pointed out that "[d]irect evidence 'essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus.'" <u>Id.</u> (citation omitted). Circumstantial evidence is evidence that allows a jury to infer intentional discrimination by the decisionmaker. <u>Id.</u> F. Kaupas claims that he has both "direct and circumstantial" evidence. (Pls.' Mem. at 2.) However, he fails to in any way classify his evidence or attempt to distinguish which evidence he believes is direct and which circumstantial. He apparently leaves this task to this court. Consequently, this court finds that F. Kaupas's evidence is best characterized as circumstantial evidence and will be analyzed as such.

The Seventh Circuit has identified three categories of circumstantial evidence under the direct method approach, "each of which may suffice by itself to establish discrimination, or may be used in conjunction with one or both of the other categories." <u>Venturelli</u>, 336 F.3d at 615. According to <u>Venturelli</u>:

> The first category consists of "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." The second type requires a showing that the employer systematically treated other, similarly situated, [black] employees better. The third type is evidence that the plaintiff was qualified for the position in question but passed

15

over in favor of a person not having the forbidden characteristic and that the employer's stated reason for its decision is "unworthy of belief, a mere pretext for discrimination." The latter category "is substantially the same as the evidence required" under the indirect method.

Id. (citations omitted). It appears that all of F. Kaupas's evidence falls within the first category.

Viewing all the evidence in the light most favorable to R. Kaupas, this court finds that material issues of fact exist. A factfinder could infer that Village intentionally discriminated against him because of his race in demoting him. First, a jury could infer that Shaw, the decisionmaker with respect to the demotion, by remaining silent and not reprimanding, remedying, or correcting employees' comments at the meeting from which a person could infer racial bias, acquiesced in the employees' comments. In other words, Shaw's silence equaled concurrence. A jury could infer that by not speaking up or admonishing the allegedly harassing black employees and allowing them to go on and on that Shaw, who is black, "said" such racially divisive things as "us vs. them," "our turn to shine," "more of us than there are of them now," and "these white mother fuckers have to go."[13] Second, a month or so after the departmental meeting, and two-and-a-half weeks after R. Kaupas submitted a letter of complaint to Martin, Shaw, for the first time, questioned F. Kaupas's taking of overtime pay. Shaw then demoted F. Kaupas because F. Kaupas allegedly lied about former chief Leonard approving such overtime. The record shows that material facts are in dispute about what Leonard said to F. Kaupas about prior practices and to deputy chief Mel Easley ("Easley") during Easley's investigation of the overtime. If a jury believes Leonard that he told F. Kaupas and/or Easley that deputy chiefs during Leonard's tenure as chief were given the option of taking financial

---

[13] The comment of Barnett-Brookins is not circumstantial evidence of intentional discrimination because it was not made by Shaw, the decisionmaker, nor can it be attributable to him.

compensation for overtime, it could infer, based on the departmental meeting and the R. Kaupas letter, which both occurred in close proximity to the overtime investigation, that Shaw demoted F. Kaupas because of F. Kaupas's race. Consequently, Village's motion for summary judgment is denied.

### B. Disparate Treatment (R. Kaupas)

R. Kaupas maintains that she was suspended by Martin because of her race. (Pls.' 56.1(b)(3)(A) Resp. ¶¶ 8, 11.) Although not explicit, this court infers that she too, like her husband, proceeds under the direct method. Again, like F. Kaupas, a reasonable jury could infer that Martin's, the decisionmaker with respect to R. Kaupas's suspension, failure to intercede or admonish other employees at the meeting was the same as him making the comments. Further, Martin did not investigate R. Kaupas's or the other employees' complaints of race discrimination. A jury could very well find that R. Kaupas did swear at Martin and this is why he suspended her. However, this court cannot make findings regarding disputed facts on summary judgement. Because factual questions exist as to whether Martin intentionally discriminated against R. Kaupas on the basis of her race, summary judgment must be denied.

### C. Hostile Work Environment (Race)

Both plaintiffs allege that their work environment at Village was so hostile that they were constructively discharged. In this Circuit, to recover on a hostile work environment claim based on race, an employee must show that: 1) he or she was subject to unwelcome harassment; 2) the harassment was based on his or her race; 3) the harassment was severe or pervasive so as to alter the conditions of the employee's environment and create a hostile or abusive working environment; and

17

4) there is a basis for employer liability. Mason v. S. Ill. Univ. at Carbondale, 233 F.3d 1036, 1043 (7th Cir. 2000). The primary issues in the case at hand are whether plaintiffs' work environment was actionably hostile and whether Village can be held liable.

"[P]laintiff[s] must . . . show that [their] work environment was both subjectively and objectively hostile." McPhaul, 226 F.3d at 566. An objectively hostile environment is one that a reasonable person would find hostile or abusive. Id. at 567. In making this assessment, courts consider the totality of the circumstances, including "'the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id. (citations omitted). In the case at hand, clearly both plaintiffs subjectively felt that their work environment at Village was hostile. Plaintiffs argue that the following made their work environments objectively hostile: the departmental meeting and lack of investigation of race-related complaints. According to several employees, the Village police department was rife with racial hostility, i.e., racial hostility was pervasive.[14] Moreover, the comments made at the departmental meeting were more than just mildly offensive utterances, teasing, or offhand remarks. Comments such as "us vs. them," "our turn to shine," and "more of us than there are of them now" imply serious racial division and segregation. Plaintiffs could reasonably have believed that their jobs—and maybe safety—were in jeopardy when black employees said things like "these white mother fuckers have to go," and supervisors Shaw and Martin stood by and did nothing to disavow themselves or Village of the comments. A jury could

---

[14] Defendants argue in their reply that such opinion testimony is not admissible. However, the employees are not opining as to the motivation of Village decisionmakers; rather, they are presenting evidence based on their perceptions of the employment environment. Such evidence is admissible under Federal Rule of Evidence 701.

find that the racially divisive remarks interfered with plaintiffs' work performance. In addition, neither Shaw nor Martin investigated the seven complaints of racial or other harassment. A jury could find that Village unreasonably refused to remedy the hostile environment. Because there are material questions of fact by which a jury could find that the work environment was objectively hostile, summary judgment cannot be granted.

Because a material question of fact remains as to whether plaintiffs' work environment was hostile, although the parties did not do so, this court must assess whether a basis exists for Village's liability. The Supreme Court, in <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742 (1998), and <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1998), set forth the test to be used to determine whether an employer is vicariously liable for an employee's conduct. The Seventh Circuit stated:

> "An employer is subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee." Vicarious liability automatically applies when the harassing supervisor is either (1) "indisputably within that class of an employer organization's officials who may be treated as the organization's proxy," or (2) "when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." Absent either of these situations, however, an employer may avoid vicarious liability by showing "(a) that the employer exercised reasonable care to prevent and correct promptly any [racially] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."

<u>Johnson v. West</u>, 218 F.3d 725, 730 (7th Cir. 2000) (citations omitted).[15]

---

[15] Although <u>Ellerth</u>, <u>Faragher</u>, and <u>Johnson</u> all involve sexual harassment, the same standard applies to racial hostile work environment claims as well. <u>See</u> <u>Hardin v. S.C. Johnson & Son, Inc.</u>, 167 F.3d 340, 345 (7th Cir. 1999).

The first question for this court is whether either Shaw or Martin qualifies as Village's proxy. With respect to Shaw at least, a question of material fact exists. As Village manager under the managerial form of government, Shaw is the administrative head of Village and has extensive powers and duties. See 65 ILCS 5/5-3-7. Shaw's duties and responsibilities are similar to a proprietor, partner, or corporate officer such that a factfinder could find that he is Village's proxy. Faragher, 524 U.S. at 789-90. The second question is whether one of plaintiffs' supervisors[16] took a tangible employment action against plaintiffs. Wolf v. Northwest Ind. Symphony Soc'y, 250 F.3d 1136, 1141 (7th Cir. 2001). If so, Village is automatically vicariously liable for the supervisor's acts. Id. at 1142. A tangible employment action "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Id. (citation omitted). In the case at hand, like in Wolf, plaintiffs were not terminated. They resigned, and now they claim to have been constructively discharged. Although the Seventh Circuit has not determined whether constructive discharge is a tangible employment action, this court need not address this issue because the undisputed facts show that plaintiffs were not constructively discharged.

"An employee can assert a claim of constructive discharge when he is forced to resign because his working conditions, from the standpoint of the reasonable employee, have become unbearable." Id. Further, "[a]bsent extraordinary conditions, 'a complaining employee is expected to remain on the job while seeking redress.'" Id. at 1143 (citation omitted). "Working conditions for constructive discharge must be even more egregious than the high standard for hostile work

---

[16] Although the parties do not address the question of plaintiffs' supervisors, it appears from the record that Martin and Shaw were supervisors within the meaning of Title VII.

environment because 'in the 'ordinary' case, an employee is expected to remain employed while seeking redress.'" Tutman v. WBBM-TV, Inc./CBS, Inc., 209 F.3d 1044, 1050 (7th Cir. 2000) (citation omitted). In the case at hand, although questions of material fact exists as to whether the work environment was hostile, this court finds that no questions of material fact remain as to whether plaintiffs' situation was so extreme as to warrant their resignation as the only alternative to avoiding or overcoming the hostile environment. Extraordinary circumstances were not present such that plaintiffs could not remain on the job. Admittedly, the environment was probably uncomfortable for plaintiffs, but they could have sought other avenues of redress other than quitting.

Because neither Martin nor Shaw took tangible employment actions against plaintiffs, the question becomes whether Village is entitled to the affirmative defense–a question Village never addresses in its summary judgment papers. Did Village exercise reasonable care to prevent and correct promptly any the racially harassing behavior? Clearly, issues of material fact remain. The sparse record on this issue evinces that supervisors Shaw and Martin took little if any action to prevent future harassment. Although Shaw distributed a memorandum to employees and sought information on instances of discrimination, neither he nor Martin took any action on the seven letters Shaw received. There are material issues of fact as to whether these claims were frivolous and baseless and whether Shaw and/or Martin took appropriate actions to remedy the allegedly hostile environment. Moreover, viewing the facts in the light most favorable to plaintiffs, as this court must, there are questions of fact as to whether Shaw or Martin corrected the allegedly hostile behavior at the June 6 departmental meeting. Because Village has not clearly advanced any evidence in support of its affirmative defense and because material factual issues remain, summary judgment must be denied.

21

A different analysis applies to the alleged hostile environment created by Box with his racially divisive comments–again, an issue the parties do not address. Because Box was not a supervisor, but rather a co-worker, courts apply the following standard in determining whether the employer can be held liable: plaintiffs must show that the employer negligently failed to take reasonable steps to discover or remedy the co-worker harassment. Haugerud v. Amery Sch. Dist., 259 F.3d 678, 696-97 (7th Cir. 2001). As discussed above, Shaw and Martin attended the meeting where Box made allegedly hostile remarks. Moreover, Shaw received complaints about Box. It is thus disputed that Village did not negligently fail to discover or remedy the allege hostile environment. As such, summary judgment is denied.

D.     Hostile Work Environment (Sex) (R. Kaupas)

R. Kaupas alleges that the one-minute e-mail video from Box constituted sexual harassment. The above racially hostile environment discussion applies with regard to R. Kaupas's sexual harassment claim. This claim fails for a several of reasons: (1) the harassment was not severe or pervasive; (2) it was not "because of" sex; and (3) there is no basis for Village's liability.

To prevail on her claim of sexual harassment based on hostile work environment, F. Kaupas must establish that: (1) she was subjected to unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (2) the conduct was severe or pervasive enough to create a hostile work environment; (3) the conduct was directed at her because of her sex; and (4) there is a basis for employer liability. Hilt-Dyson v. City of Chicago, 282 F.3d 456, 462-63 (7th Cir.2002). Here, first, the undisputed facts show that R. Kaupas viewed the video one time only, after which she immediately deleted it. The video was one-minute in duration. This appears

to have been the first time she received such an e-mail video from Box. Moreover, the e-mail did not contain any text and was from a co-worker, not a supervisor. This court finds that this video harassment was not severe or pervasive. Second, this court finds that the video was not mailed to R. Kaupas because of her sex. Box showed the same video to officer Tomany, a male, a few months before Box e-mailed it to R. Kaupas. (Pls.' 56.1(b)(3)(A) Resp. ¶ 145.) Finally, and most importantly, plaintiffs have not pointed to any evidence showing that Village can be held liable for Box's, a co-worker, alleged harassment. The undisputed facts show that R. Kaupas did not ever report the e-mail video incident to Village. (Pls.' 56.1(b)(3)(A) Resp. ¶ 148.) Plaintiffs have not introduced any evidence by which a factfinder could find that Village negligently failed to take reasonable steps to discover or remedy Box's harassment. Consequently, Village's motion for summary judgment on this claim is granted.

VI.   Count VI Intentional Infliction of Emotional Distress Claims

    This court is not exactly sure which plaintiff (or perhaps both) is bringing the pendent intentional infliction of emotional distress ("IIED") claims. Even assuming it is both plaintiffs, defendants are entitled to summary judgment for two reasons. First, plaintiffs do not in their memorandum in response respond in any way to defendants' arguments made in their opening memorandum. Outside of the consolidated amended complaint, plaintiffs never address their IIED claims. As such, these claims are waived. See Thompson v. G.E.S., Exposition Serv., 2001 WL 321998, at *3 (N.D. Ill. Apr. 2, 2001). Second, even if thy are not waived, "[t]he Illinois Human Rights Act preempts tort claims that are 'inextricably linked' to allegations of sexual harassment and requires that such claims be brought only before the Illinois Human Rights Commission." Quantock v. Shared Mktg. Servs., Inc., 312 F.3d 899, 905 (7th Cir. 2002). Such reasoning presumably extends

to IIED claims predicated on racial harassment as well. Because any IIED claims plaintiffs may have stem directly from their employment relationship with Village and relate to racial and/or sexual harassment, they are preempted. Therefore, defendants' motion for summary judgment is granted.

VII.    Count VII Loss of Consortium Claim

R. Kaupas advances a loss of consortium claim. Again, as with the IIED claim, because plaintiffs do not respond to defendants' arguments, introduce any evidence, or address this claim at all, it is deemed waived. Plaintiffs do not advance any arguments or evidence to show that any issue of material fact exists with respect to this claim. Consequently, defendants' motion for summary judgment is granted.

## CONCLUSION

For the reasons discussed above, summary judgment is granted in part and denied in part. As to the § 1983 claims against Village and Board (count I), § 1983 equal protection disparate treatment claim against Box (count I), § 1983 equal protection hostile work environment claim against Box (count I), R. Kaupas's 1st Amendment retaliation claim (count I), all § 1985 claims (count II), all § 1986 claims (count III), R. Kaupas's sexual harassment claim (count V), intentional infliction of emotional distress claims (count VI), and R. Kaupas's loss of consortium claim (count VII), summary judgment is granted. As to the remaining claims, summary judgment is denied.

The pre-trial schedule previously set is modified as follows: the final pretrial order is due on or before September 9, 2003; motions in limine are due also on September 9 and should be filed separately from the final pretrial order and separately from one another; responses to motions in limine, if any, are to be filed no later than September 16, 2003; the final pretrial conference is set for

24

September 23, 2003, at 4:30 p.m. Trial remains set to commence at 9:00 a.m. on September 29, 2003.

To make it patently clear for trial preparation purposes, this court has summarized the remaining claims in the table below. The parties are strongly encouraged to discuss settlement.

| Count | Claim | Plaintiff(s) | Defendant(s) |
|-------|-------|-------------|--------------|
| I | Section 1983 disparate treatment | F. Kaupas | Shaw |
| I | Section 1983 disparate treatment | R. Kaupas | Martin |
| I | Section 1983 hostile work environment (race) | Both | Shaw, Martin |
| I | Section 1983 1st Amendment retaliation | F. Kaupas | Shaw |
| IV | Section 1981 disparate treatment | F. Kaupas | Village |
| IV | Section 1981 disparate treatment | R. Kaupas | Village |
| IV | Section 1981 hostile work environment | Both | Village |
| V | Title VII disparate treatment | F. Kaupas | Village |
| V | Title VII disparate treatment | R. Kaupas | Village |
| V | Title VII hostile work environment (race) | Both | Village |

ENTER:

*James F. Holderman*

JAMES F. HOLDERMAN
United States District Judge

DATE: August 29, 2003